UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LELAND HARRIS,

       Plaintiff,                                      Hon. Gordon J. Quist

v.                                                       Case No. 1:14-CV-36

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.
_____/

## REPORT AND RECOMMENDATION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under Titles II and XVI of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security

case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## **PROCEDURAL POSTURE**

Plaintiff was 45 years of age on his alleged disability onset date. (Tr. 252). He successfully completed high school and worked previously as a machine tender, assembler, and general welder. (Tr. 1042). Plaintiff applied for benefits on November 14, 2007, alleging that he had been disabled since May 1, 2007, due to torn ligaments in both hands and shoulder surgery. (Tr. 252-57, 282). Plaintiff's applications were denied, after which time he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 97-150). On December 1, 2009, Plaintiff appeared before ALJ Daniel Dadabo with testimony being offered by Plaintiff and a vocational expert. (Tr. 41-76). In a written decision dated July 14, 2010, the ALJ determined that Plaintiff was not disabled. (Tr. 12-21). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 1-7). Plaintiff subsequently initiated an action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

On February 28, 2012, the parties stipulated to remand the matter to the Commissioner for further consideration. (Tr. 1149-50). On February 12, 2013, Plaintiff appeared before ALJ Donna Grit with testimony being offered by Plaintiff and a vocational expert. (Tr. 1058-96). In a written decision March 15, 2013, the ALJ determined that Plaintiff was not disabled. (Tr. 1026-43). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 1014-20). Plaintiff subsequently initiated the present action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

Plaintiff's insured status expired on December 31, 2007. (Tr. 1029). Accordingly, to be eligible for Disability Insurance Benefits under Title II of the Social Security Act, Plaintiff

3

must establish that he became disabled prior to the expiration of his insured status. *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

## RELEVANT MEDICAL EVIDENCE

On May 4, 2005, Plaintiff underwent left shoulder surgery to treat bursitis. (Tr. 874-78).

On February 10, 2006, Plaintiff was examined by Dr. David Cashbaugh. (Tr. 868-73). Plaintiff reported that he was unable to work due to depression "caused by life." (Tr. 868). Plaintiff reported experiencing various interpersonal difficulties as well as legal problems related to a pending charge for cocaine possession. (Tr. 869). The results of a mental status examination were unremarkable. (Tr. 871-73). Plaintiff was diagnosed with alcohol abuse, cocaine abuse (early partial remission), and depressive disorder. (Tr. 873). Plaintiff's GAF score was rated as 55.[1] (Tr. 873).

On February 15, 2006, Plaintiff was examined by Dr. Donald Sheill. (Tr. 864-65). Plaintiff reported that his girlfriend "forces him to do so some jobs" and, moreover, that "he does some snow shoveling as well." (Tr. 864). An examination revealed the following:

> The hands are free of atrophy, swelling, or deformity. He does exhibit some mild calluses of the palms and his grips are 5/5. Fine and gross dexterity are normal. The left shoulder is notable only for portal scars but no atrophy. The right shoulder also appears unremarkable. Both shoulders are slightly tender in the subacromial area. Both shoulders appear mildly uncomfortable with end range of motion abduction. Both are strong in resisted abduction, internal

---

[1] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV). A GAF score of 55 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

>           rotation, and external rotation. The trapezius muscles are somewhat
>           firm on the left and soft on the right but otherwise unremarkable.
>           There were no radicular symptoms with neck range of motion testing.
>           The upper extremity DTRs are $+2^2$ throughout. The spine and lower
>           extremities are unremarkable. The gait is normal, the reflexes are
>           symmetric, the tandem gait is unremarkable, squat and recover is full,
>           and strength is intact walking on heels and toes.

(Tr. 865).

In 2007, Plaintiff began experiencing wrist difficulties. (Tr. 394-403, 447). Specifically, Plaintiff was diagnosed with scapholunate dissociation[3] of the left and right wrist. (Tr. 394-403, 447). On February 21, 2008, Dr. Donald Condit performed wrist reconstruction surgery on Plaintiff's right wrist. (Tr. 474-75). Treatment notes dated June 23, 2008, indicate that Plaintiff's right wrist was "making reasonable progress." (Tr. 949). X-rays of Plaintiff's right wrist, taken March 17, 2009, were "negative." (Tr. 509).

On April 28, 2009, Plaintiff participated in an MRI examination of his left knee, the results of which were "negative." (Tr. 508).

On May 22, 2009, Dr. Condit reported that Plaintiff was not experiencing pain or pathology with respect to his right wrist. (Tr. 514). The results of an examination were unremarkable and the doctor observed that Plaintiff "seems to be getting along reasonably well." (Tr. 514). The doctor recommended that Plaintiff "use his wrist to tolerance" and further noted that, "I am not inclined to recommend any specific work restrictions." (Tr. 514).

---

[2] Deep tendon reflexes are assessed pursuant to a scale from 0-5+. *See* Deep Tendon Reflexes, available at http://www.neuroexam.com/neuroexam/content.php?p=31 (last visited on March 24, 2015). A score of 2+ is considered "normal." *Id.*

[3] Scapholunate dissociation "is the most common carpal instability." *See* Scapholunate Dissociation, available at http://www.rcsed.ac.uk/fellows/lvanrensburg/classification/hand/scapholunate_diss.htm (last visited on March 23, 2015). This condition is generally treated surgically. *Id.*

On December 15, 2009, Plaintiff reported that he recently took a trip to Arkansas where he had a "good time" with "all [his] people." (Tr. 918). Plaintiff also reported that he wanted to begin attending school. (Tr. 918).

On December 17, 2009, Dr. Donald Sheill completed a report regarding Plaintiff's physical abilities. (Tr. 557-62). The doctor reported that Plaintiff can lift/carry up to 20 pounds. (Tr. 557). The doctor reported that during an 8-hour workday, Plaintiff can sit for 8 hours, stand for 4 hours, and walk for 4 hours. (Tr. 558). The doctor reported that Plaintiff can only occasionally reach overhead, with either upper extremity, but can more frequently perform reaching and handling activities. (Tr. 559).

On March 15, 2011, Plaintiff underwent left wrist surgery. (Tr. 945). A March 30, 2011 examination indicated that Plaintiff's surgery was successful and that he was "making reasonable progress." (Tr. 945). Treatment notes dated June 22, 2011, reiterated that Plaintiff's left wrist was making "reasonable progress." (Tr. 1483).

On August 22, 2011, Dr. Condit was deposed as part of a worker's compensation claim Plaintiff was pursuing. (Tr. 1338-65). The doctor testified that Plaintiff's right wrist surgery was successful. (Tr. 1348). Dr. Condit further testified that he "would not restrict" Plaintiff's use of his right wrist. (Tr. 1351). The doctor elaborated that Plaintiff "could work as his wrist allowed," but that he might experience difficulty with "high force, impact loading" activities or movements "in extremes of flexion or extension." (Tr. 1351). The doctor indicated that "more moderate activities with the wrist more neutral should be best tolerated." (Tr. 1351). With respect to Plaintiff's more recent left wrist surgery, the doctor reported that the surgery was a success, but that it was "still relatively early" to assess Plaintiff's ability to use his wrist going forward. (Tr. 1352-53,

1362). The doctor nevertheless indicated that at the moment he "might say [to Plaintiff] wear a splint" or "might put a 20-pound weight limit" on Plaintiff. (Tr. 1362-63).

On September 29, 2011, Plaintiff was examined by Dr. Mark DeHaan. (Tr. 1367-71). An examination of Plaintiff's upper extremities revealed the following:

> Range of motion is normal and without restriction for the shoulders, elbows and forearms. Wrist motion on the right demonstrates 35 degrees of flexion and 40 degrees of extension. On the left, he has 25 degrees flexion and 30 degrees extension. Finger and thumb range of motion is normal, bilaterally. All tendons are intact. There is no guarding with regard to range of motion. Both upper extremities have a normal color, temperature and sweat pattern. There are no atrophic changes. The hands show a normal pattern of use. There is no identifiable swelling in either hand or wrist region. Tinel's and Phalen's tests are negative, bilaterally. Finkelstein's and Allen's tests are negative, bilaterally. There are no identifiable masses in the hands or wrists. All surgical scars are well healed, flat and non hypertrophic. There are no signs of extensor or flexor tenosynovitis in the hands or wrists. There are no identifiable masses. There is no muscle atrophy or intrinsic weakness. The carpometacarpal joints are nontender and stable, bilaterally. Grid tests for basilar joints of the right and left thumbs are negative. The distal radioulnar joints are stable, bilaterally.
>
> Grip strength testing was done with a Jamar dynamometer. This was done at five consecutive settings. This was done under my direct supervision. The patient was asked to express pain during the testing. He did not express any pain while performing the test. The patient was asked to give his full and complete effort. The right extremity values are as follows: 25 pounds, 40, 30, 40 and 35 pounds. The left upper extremity was as follows: 15 pounds, 20, 20, 25 and 20 pounds. The values with regards to the right and left upper extremities demonstrate a non-valid curve. These values suggest a submaximal effort. There is not a clinical basis on examination to explain the degree of grip strength weakness demonstrated from an organic basis. These demonstrate a submaximal effort.

(Tr. 1369-70).

Dr. DeHaan concluded as follows:

> In my opinion, [Plaintiff] is fully recovered. He has reached maximal medical improvement. His condition has stabilized. No further medical treatment or tests are necessary for the right upper extremity. Based on his current clinical exam, there is no medical basis to impose ongoing work restrictions for the right upper extremity. His current level of symptoms and findings on clinical exam of the right upper extremity do not corroborate or support the subjective complaints he presents with. In addition, x-rays show good stability of the wrist with no new changes.
>
> With regards to the left upper extremity, I do not identify in the history that this would be causally related to his employment of the past. He does not give any clear history of any subsequent traumas.
>
> Of interest is the x-ray examination report dated December 3, 2007, five views of the left writst at Hackley Hospital, showing a normal x-ray examination. In addition, medical records do not support any symptoms or concerns with regard to the left wrist in the past that would be related to his past employment with Steel Form Systems.
>
> Mr. Harris has sought ongoing treatment with Dr. Condit for the left wrist pain and appears to be recovering satisfactorily from his recent surgery. X-rays of the left wrist show satisfactory bony alignment and no degenerative changes. His current level of symptomatology regarding the left wrist is not clinically correlated on clinical exam.
>
> In summary, it is my opinion that Leland Harris has fully recovered from his right wrist injury, which was considered causally related to his employment at Steel Form Systems. He may use the right upper extremity in an unrestricted fashion. I do not identify in the medical records or history of any injury of the left wrist, which would be related to his past employment.
>
> Due to his current surgery, he may need restrictions with regard to the function of the left wrist. However, at the time of this exam, he appears to have recovered satisfactorily. The only residual change is a change in range of motion of the left wrist. Otherwise, the left upper extremity function is satisfactory.

(Tr. 1370-71).

X-rays of Plaintiff's lumbar spine, taken July 11, 2012, revealed "mild" degenerative changes. (Tr. 1492). On August 10, 2012, Plaintiff participated in an MRI examination of his

8

lumbar spine, the results of which revealed diffuse disc bulges with no evidence of nerve root interference. (Tr. 1494).

On October 24, 2012, Dr. Condit reported that Plaintiff had achieved "maximum medical improvement" with respect to his wrists. (Tr. 1477-78). The doctor imposed on Plaintiff the following "permanent" limitations: (1) no lifting more than 20 pounds and (2) he cannot use his wrists to perform "high impact" or "forceful" activities. (Tr. 1478). On November 14, 2012, Dr. Condit further articulated Plaintiff's functional capabilities. (Tr. 1486-91). The doctor reported that Plaintiff can continuously, defined as "more than two-thirds of the time," lift and carry up to 10 pounds and can frequently, defined as "from one-third to two-thirds of the time," lift and carry 20 pounds. (Tr. 1486). The doctor reported that during an 8-hour workday, Plaintiff can sit, stand, and walk for 8 hours each. (Tr. 1487). With respect to Plaintiff's ability to use his hands and upper extremities, the doctor reported that Plaintiff can: (1) occasionally, defined as "very little to one-third of the time," reach overhead and push/pull; (2) frequently reach in all other directions; and (3) continuously perform handling, fingering, and feeling activities. (Tr. 1488).

X-rays of Plaintiff's knees, taken November 1, 2012, "don't show any consequential abnormality." (Tr. 1472). The doctor concluded that Plaintiff "has questionable pain tolerance." (Tr. 1471).

On April 17, 2012, Dr. DeHaan was deposed as part of a worker's compensation claim Plaintiff was pursuing. (Tr. 1379-1419). The doctor reported that "there's nothing from an objective or even a provocative perspective on his clinical exam to suggest that there's any ongoing injury or residual change or concern as far as problems with his wrists or upper extremities as a whole." (Tr. 1411-12).

9

Treatment notes dated August 20, 2012, indicate that Plaintiff enjoys being outside and working in his vegetable garden. (Tr. 1430). The results of a mental status examination were unremarkable and Plaintiff's GAF score was rated as 65.[4] (Tr. 1430).

X-rays of Plaintiff's knees, taken March 29, 2012, were "normal." (Tr. 1424). A July 18, 2012, examination of Plaintiff's knees revealed only "minimal" findings insufficient to explain Plaintiff's subjective complaints. (Tr. 1421). The doctor reiterated that x-rays of Plaintiff's knees "are really quite unremarkable." (Tr. 1421).

## **ANALYSIS OF THE ALJ'S DECISION**

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[5] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a

---

[4] A GAF score of 65 indicates that the individual is experiencing "some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* at 34.

[5]
1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable to perform his previous work, and cannot, considering his age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five of the sequential evaluation process, Plaintiff bears the burden of proof through step four of the procedure, the point at which his residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffers from: (1) impingement tendonopathy involving both shoulders; (2) gastroesophageal reflux disease (GERD); (3) headaches; (4) scapholunate dissociation left wrist, status post-repair of same; (5) lumbar degenerative disc disease with myositis and L5 radiculopathy; (6) bilateral sacroliliac joint dysfunction with left hip bursitis; (7) early left hip degenerative changes initially diagnosed in 2010; (8) asthma; and (9) depressive disorder, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 1029-30).

The ALJ next determined that Plaintiff retained the capacity to perform work subject to the following limitations: (1) he can lift 20 pounds occasionally and 10 pounds frequently; (2)

11

during an 8-hour workday, he can stand/walk and sit for six hours each; (3) he is limited to less than frequent climbing, balancing, crouching, crawling, kneeling, overhead reaching, and pushing/pulling; (4) he must avoid concentrated exposure to fumes, dusts, gases, odors, poor ventilation, extremes of heat or cold, and vibration; (5) he can understand, remember, and perform simple tasks, make simple work-related decision; and interact appropriately with co-workers, supervisors, and others. (Tr. 1030).

The ALJ found that Plaintiff cannot perform his past relevant work at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, his limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned a vocational expert.

The vocational expert testified that there existed in the state of Michigan approximately 6,500 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 1090-95). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274

(6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). The ALJ concluded, therefore, that Plaintiff was not entitled to disability benefits.

I.         **The Medical-Vocational Guidelines**

The medical-vocational guidelines, also known as the "grids," consider four factors relevant to a particular claimant's employability: (1) residual functional capacity, (2) age, (3) education, and (4) work experience. 20 C.F.R., Part 404, Subpart P, Appendix 2. Social Security regulations provide that "[w]here the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00. In other words, a claimant may be awarded benefits if he satisfies the requirements of one of the particular rules correlating to a finding of disability. *See Russell v. Commissioner of Social Security*, 20 F. Supp.2d 1133, 1134 (W.D. Mich. 1998).

Plaintiff argues that he is entitled to relief because he meets the requirements of Rule 201.04 of the Grids. This particular rule applies to claimants of "advanced age." 20 C.F.R., Part 404, Subpart P, Appendix 2, Rule 201.04. Advanced age is defined as age "55 and over." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201.00(f). Plaintiff was age 50 on the date of the ALJ's decision. (Tr. 1042-43). As Plaintiff did not satisfy the requirements of this Rule, this argument is rejected.

## II.  Medical Opinion Evidence

Plaintiff objects to the ALJ's assessment of the medical evidence in this matter. As discussed below, Plaintiff has failed to identify any error in the ALJ's assessment of the medical evidence in this matter. Instead, Plaintiff merely disagrees with the weight the ALJ assigned to certain portions of the medical record, a circumstance which does not warrant relief.

In 2008, Dr. William Jackson reviewed the medical record, as it then existed, and completed a report regarding Plaintiff's physical residual functional capacity. (Tr. 451-58). Dr. Jackson's assessment is consistent with the ALJ's subsequent RFC determination. The ALJ analyzed Dr. Jackson's opinions in light of the then existing medical record and afforded such "significant weight," noting that the doctor's opinion "was based upon the medical evidence in file at a point in time that was nearly contemporaneous with the alleged onset date." (Tr. 1033).

Plaintiff seems to assert that it was inappropriate for the ALJ to afford such weight to a medical opinion offered without benefit of subsequently procured medical evidence. While the assessment of any medical opinion must consider the extent to which such is consistent with other medical evidence, *see Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 375 (6th Cir. 2013), Plaintiff has identified no authority for the proposition that a medical opinion is rendered infirm based solely on the quantum of evidence procured subsequent thereto. The ALJ analyzed Dr. Jackson's opinion, specifically recognizing that such was based only upon the then available evidence. The ALJ's assessment of Dr. Jackson's opinion is supported by substantial evidence. Accordingly, this argument is rejected.

Likewise, William Schirado, Ph.D. evaluated the then-existing evidence and offered an opinion as to Plaintiff's emotional impairments and the extent to which such limited Plaintiff's

ability to function. (Tr. 460-73). The doctor determined that Plaintiff was very minimally impaired. The ALJ afforded only "partial weight" to Dr. Schirado's opinion. (Tr. 1033). Specifically, the ALJ found the doctor's reasoning sound, but determined that Plaintiff was slightly more limited than Dr. Schirado asserted. (Tr. 1033). Again, Plaintiff seems to argue that the ALJ should have simply rejected the doctor's opinion because it did not (and could not have) taken into account subsequent medical evidence. As noted above, Plaintiff has identified no authority in support of this position. The ALJ's assessment of Dr. Schirado's opinion is supported by substantial evidence. Accordingly, this argument is rejected.

Dr. Sheill examined Plaintiff on two occasions: (1) February 15, 2006, and (2) December 17, 2009. (Tr. 553-64, 864-67). The doctor subsequently opined that Plaintiff was limited to an extent fairly consistent with the ALJ's RFC determination. (Tr. 557-62). The ALJ detailed Dr. Sheill's opinions assigning to such only partial weight. (Tr. 1037). Plaintiff faults the ALJ for assigning greater weight to Dr. Sheill's opinion than to the opinion offered by Dr. Montes.

Plaintiff was examined by Dr. Montes on a single occasion in 2009. (Tr. 527-44). Dr. Montes determined that Plaintiff was subject to the following *permanent* restrictions: (1) no lifting more than five pounds; (2) no bending, squatting, kneeling, crawling, or climbing stairs; (3) no repetitive activities; (4) no reaching overhead; and (5) walking only "to tolerance." (Tr. 536). The doctor concluded that Plaintiff "is incapable of any gainful employment, not even sedentary type of employment." (Tr. 536).

First, because Dr. Montes examined Plaintiff on a single occasion his opinion is not entitled to any deference. *See Kornecky v. Commissioner of Social Security*, 167 Fed. Appx. 496, 506 (6th Cir. 2006). The ALJ nevertheless discussed at length Dr. Montes' opinions, concluding

15

that such were inconsistent with the findings of his own examination. (Tr. 1036-37). The ALJ further determined that Dr. Montes' opinions were "unsupported by the substantial evidence" and, moreover, were contradicted by the findings of other contemporaneous examinations. (Tr. 1036-37). The ALJ's assessment of Dr. Montes' opinion is supported by substantial evidence. Plaintiff has not identified any legal shortcoming with the ALJ's assessment of Dr. Montes' opinion, but instead simply laments that the ALJ did not assign greater weight to such. Accordingly, this argument is rejected.

Plaintiff next challenges the ALJ's evaluation of Dr. Condit's opinions and findings. As previously noted, Dr. Condit performed the surgeries on Plaintiff's wrists. Dr. Condit subsequently imposed on Plaintiff limitations consistent with the ALJ's RFC determination. (Tr. 1477-78, 1486-91). The ALJ assigned significant weight to Condit's opinion. (Tr. 1040). The ALJ based this conclusion on the doctor's medical specialty, his lengthy treatment relationship with Plaintiff, and the results of his examinations of Plaintiff. (Tr. 1040). The only error Plaintiff cites with respect to the ALJ's evaluation of Dr. Condit's opinion is that the ALJ "failed to note that Dr. Condit had only treated Plaintiff's upper extremities and had not examined the other parts of his body, which [Dr.] Montes had done." First, the ALJ did make clear that Dr. Condit treated Plaintiff's upper extremity impairments. Moreover, even had the ALJ failed to do so, such does not somehow elevate the weight that should be afforded to Dr. Montes' opinions. As previously noted, Dr. Montes examined Plaintiff on only one occasion and offered opinions that enjoy absolutely no support in the record. The ALJ's assessment of Dr. Condit's opinions is supported by substantial evidence. Accordingly, this argument is rejected.

Plaintiff next takes issue with the ALJ's apparent decision to afford greater weight to Dr. DeHaan's opinions over Dr. Montes' opinions. Plaintiff argues that the ALJ's basis for doing so was the fact that Dr. DeHaan examined Plaintiff twice whereas Dr. Montes examined Plaintiff only once. A review of the ALJ's decision, however, reveals that this was not the basis for the weight assigned to such. (Tr. 1037-38). Rather, the ALJ noted that Dr. DeHaan was "a board certified expert in the treatment of conditions limited to the hands and upper extremities." (Tr. 1038). The ALJ also noted the findings of Dr. DeHaan's examinations as well as his assessment of the objective medical evidence. (Tr. 1037-38). The ALJ's assessment of Dr. DeHaan's opinions is supported by substantial evidence whereas Dr. Montes' opinion, as discussed above, was properly discounted. Accordingly, this argument is rejected.

Finally, Plaintiff objects to the ALJ's assessment of Dr. Moulton's opinion. Specifically, Plaintiff asserts the following:

> The ALJ seemingly avoids the obvious conclusion that Dr. Moulton was a treating orthopedic specialist in this case, even though he obviously saw Plaintiff more frequently and more recently than most of the physicians who were highlighted in [the ALJ's] opinion. She dismisses his treatment of Plaintiff as 'intermittent' and states that he did not offer an opinion as a treating source even though he saw Plaintiff more frequently that Drs. Sheill and DeHaan.

(Dkt. #13 at Page ID#1570).

Plaintiff's argument is misplaced. First, the ALJ did not "avoid the conclusion" that Dr. Moulton was a treating physician, but instead the ALJ simply (and accurately) observed that Dr. Moulton did not offer any opinion regarding Plaintiff's impairments and/or limitations. (Tr. 1039). While the ALJ accurately noted that Plaintiff treated with Dr. Moulton only intermittently, the ALJ did not dismiss the doctor's observations. To the contrary, the ALJ noted that Dr. Moulton's

findings and observations undercut Plaintiff's subjective allegations and did not support his request for benefits. (Tr. 1039). The ALJ's evaluation of Dr. Moulton's findings and observations is supported by substantial evidence. Accordingly, this argument is rejected.

### III.          Hypothetical Question to Vocational Expert

As previously noted, in determining that there existed a significant number of jobs which Plaintiff could perform despite his impairments, the ALJ relied upon the testimony of a vocational expert. Plaintiff asserts that he is entitled to relief because the hypothetical question posed to the vocational expert did not accurately describe Plaintiff's limitations.

While the ALJ may satisfy her burden through the use of hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996). The hypothetical question which the ALJ posed to the vocational expert simply asked whether there existed jobs which an individual could perform consistent with Plaintiff's RFC, to which the vocational expert indicated that there existed approximately 6,500 such jobs in the state of Michigan. The ALJ's RFC determination is supported by substantial evidence and there was nothing improper or incomplete about the hypothetical questions the ALJ posed to the vocational expert. Accordingly, this argument is rejected.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within such time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  March 26, 2015        /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge